# **EXHIBIT A**

McMORAN, O'CONNOR BRAMLEY & BURNS, PC
Michael F. O'Connor Bar No. 047401995
Ramshorn Executive Centre
2399 Highway 34
Bldg. D Suite D-1
Manasquan, New Jersey 08736
(732) 223-7711
Attorneys for Plaintiff,
Brian Nash

| | |
|---|---|
| BRIAN NASH, | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: MONMOUTH COUNTY |
| Plaintiff, | |
| vs. | Docket No. MON-L-____-22 |
| NEAR NORTH AMERICA, INC., NEAR INTELLIGENCE HOLDINGS, INC., NEAR INTELLIGENCE, INC., LAURENT CASTAILAC, GLADYS KONG and ANIL MATTEWS, | Civil Action<br><br>COMPLAINT AND JURY DEMAND |
| Defendant. | |

BRIAN NASH, by way of complaint against defendants Near North America, Inc., Near Intelligence Holdings, Inc., Near Intelligence, Inc., Laurent Castailac, Gladys Kong and Anil Mattews, says:

## STATEMENT OF THE CASE

1. This is a case of unlawful retaliation brought pursuant to the New Jersey Conscientious Employee Protection Act (CEPA), *N.J.S.A.* 34:19-3.

2. The defendants are in the business of purchasing data collected from consumers' mobile devices, enhancing the data and either reselling the data to customers who use the data in targeted marketing and advertising campaigns or using the data to run such campaigns for the clients.

3. The data includes precise geolocation data that allows defendants' customers to track consumers' movements to and from sensitive locations associated with medical care, reproductive health, religious worship, mental health, etc.

4. For example, on May 18, 2023, defendants were mentioned in a Wall Street Journal Article captioned, "Antiabortion Group Used Cellphone Data to Target Ads to Planned Parenthood Visitors." Antiabortion Group Used Cellphone Data to Target Ads to Planned Parenthood Visitors - WSJ

5. For good reason, defendants, the entities from whom they purchase data and the entities to whom they sell data are subject to various privacy laws and regulations.

6. Among other things, those laws and regulations prohibit companies like Near from selling a consumer's personal data without the consumer's consent.

7. Defendants' customers required defendants to confirm their compliance with privacy laws and standards in their agreements with defendants.

8. In customer agreements, SEC filings and other documents, defendants repeatedly and falsely represented to customers and investors that they were compliant with such privacy laws and standards.

9. Plaintiff was Near North America, Inc.'s Vice President, Business Development.

10. During January and February 2023, plaintiff objected to defendants' lack of compliance with applicable privacy laws and regulations.

11. Plaintiff also objected to the fraudulent statements defendants had made in customer agreements and elsewhere to induce its customers to do business.

12. On March 2, 2023, without warning, defendants terminated plaintiff's employment.

13. The reason defendants gave to plaintiff – that he was not a "good cultural fit" – made no sense and was a pretext for unlawful retaliation.

14. Defendants had promoted plaintiff to vice president a mere five months earlier.

15. Defendants terminated plaintiff's employment in retaliation for his protected activities.

16. At the time of the termination, Near Intelligence Holdings, Inc. was preparing for an initial public offering, which ultimately occurred in March 2023.

17. The defendants terminated plaintiff's employment and that of other employees whose whistleblowing activities threatened upper management's singular goal of maximizing the sale price for their shares of stock after the mandatory 180-day waiting period following the initial public offering had expired.

18. Defendants terminated plaintiff's employment in violation of CEPA.

19. Accordingly, plaintiff seeks judgment against defendants and awarding him the remedies authorized by law.

## THE PARTIES

20. Plaintiff Brian Nash is a resident of Sea Girt, Monmouth County, New Jersey.

21. Nash is the former Vice President, Business Development for Near North America, Inc.

22. Defendant Near North America, Inc. (NNA) is a Delaware corporation with a principal place of business at 100 Walnut Street, Pasadena, CA 91124.

23. Defendant Near Intelligence Holdings, Inc. ("NHI") is a Delaware corporation with a principal place of business at 100 Walnut Street, Pasadena, CA 91124.

24. NNA is or was a wholly-owned subsidiary of NHI.

-3-

25. During plaintiff's employment, NNA and NHI had common owners, directors and officers.

26. During plaintiff's employment, NHI made decisions that affected the employees of NNA, including decisions related to hiring, promotions, compensation and terminations.

27. During plaintiffs' employment, plaintiff participated in benefit plans sponsored and/or administered by NHI.

28. During plaintiffs' employment, NHI had control over NNA's financial matters.

29. At all relevant times, NNA and NHI functioned as an integrated enterprise.

30. At all relevant times, NNA and NHI functioned as plaintiff's joint employers.

31. On or about March 23, 2023, NHI, including NNA, merged with other entities in a SPAC transaction.

32. The new company is named Near Intelligence, Inc.

33. Defendant Near Intelligence, Inc. is a Delaware corporation with a principal place of business at 100 Walnut Street, Pasadena, CA 91124.

34. Near Intelligence, Inc. is the successor to NHI and NNA.

35. At all relevant times, defendant Laurent Castailac was Near's Vice President, Sales. Castailac was plaintiff's immediate supervisor at the time of plaintiff's termination from employment.

36. At all relevant times, defendant Gladys Kong was Near's Chief Operating Officer.

37. At all relevant times, defendant Anil Mattews was Near's Chief Executive Officer.

38. Collectively, Castailac, Kong and Mattews shall be referred to as the "Individual Defendants."

**DEFENDANTS' UNLAWFUL AND FRAUDULENT BUSINESS PRACTICES**

39. During plaintiff's employment, NNA, NHI and affiliated companies (collectively "Near") were in the business of purchasing, storing, enhancing and reselling data, including but not limited to geolocation data, collected from consumers' mobile devices.

40. The data included precise geolocation data that allowed customers to track the consumers' movements to and from various locations, including locations associated with medical care, reproductive health, religious worship, mental health and other sensitive areas.

41. In other cases, Near would provide customers with an un-hashed Mobile Ad ID and with that a derived common evening and/or common daytime location as well as other derivatives and insights on the data.

42. Customers could utilize those data points together with other data to identify or "de-anonymize" consumers who had purportedly been anonymized.

43. Near also used the data to run marketing campaigns for clients.

44. Near also transmitted personal data collected in the European Union.

45. Near and the entities with whom it transacted business were and are subject to various data privacy laws and regulations like the California Consumer Privacy Act (CCPA), the California Privacy Rights Act (CPRA) and the European Union's General Data Privacy Regulation (GDPR).

46. For example, Near was and is subject to the CCPA because at all relevant times it has had (a) in excess of $25 million in annual gross revenue (b) bought, sold, received or shared the personal data of 50,000 or more consumers and (c) derived 50% or more of its annual revenue from selling or sharing personal data

47. Among other things, those laws and regulations prohibit companies from selling consumer data that may be used to identify and/or de-anonymize consumers or track them to sensitive locations without their consent.

48. For example, under the CCPA, Cal. Civ. Code §§ 1798.100, 110 and 115, consumers have the right to know what personal information is collected, used and shared with third parties.

49. Consumers also enjoy the right to access their own data, delete their information, and importantly, to opt out of their information being "sold" for monetary or "other valuable consideration". Cal. Civ. Code §§ 1798.105, 120.

50. Under the applicable laws and regulations, businesses like defendant that sell or share consumer data must provide clear and conspicuous links to consumers to allow them to opt out of the sale or sharing of personal data and/or limit the use or disclosure of personal data. See, e.g., Cal. Civ. Code § 1798.135.

51. Those laws and regulations further require companies that process personal data to implement security measures to protect such data.

52. For example, Articles 28 and 32 of GDPR require parties that process data on behalf of a controller to maintain appropriate technical and organizational measures to protect personal data against unauthorized access and to include a process for regularly testing its effectiveness.

53. Where such personal data is disclosed to a third party, the party sharing or selling the data must obtain sufficient guarantees in writing to ensure the protection of the rights of the data subject.

54. Such guarantees are required also in relation to any further onward transfers by a third party to another party and these are also obligated to be under documented instructions.

55. Articles 33 and 34 of GDPR mandate strict data breach notification obligations that can be triggered if there is a security breach.

56. The notification must include specific information regarding the security breach and these are required to be imposed on the third parties handling the personal data.

57. Under Article 44 of the GDPR, transfers of personal data outside of the GDPR may only occur if appropriate safeguards have been followed, which ensure an adequate level of protection.

58. The safeguards apply to onward transfers of personal data to other parties in other countries.

59. During plaintiff's employment, NNA was not compliant with applicable privacy laws, regulations and industry standards.

60. For example, Near frequently failed to take adequate security measures to protect the data it stored, such as encrypting data, limiting employee access to data, requiring employees to use VP to access data, requiring employees to change passwords, utilizing multi-factor authentication, etc.

61. Near also frequently failed to ensure that the personally identifiable information it sold was hashed or otherwise protected.

62. Nonetheless, to induce customers to transact business with Near, and to induce investors to invest in Near, defendants repeatedly made knowingly false misrepresentations that they were compliant with applicable laws, regulations and standards.

63. For example, in a document Near made available to third parties entitled, "Near Privacy-Forward Policies," Near fraudulently stated that they were "in compliance with regulatory statutes like CCPA, GPDR, PIPEDA, etc."

64. In customer agreements, Near fraudulently represented that they were compliant with applicable data protection laws and industry data protection standards.

65. In SEC filings, defendants have stated that Near "seeks to ensure that our Near Platform and its products are compliant with applicable privacy regulations… Near provides for privacy notices, op-out, do not sell my data and other options to end customers that are necessary under the applicable privacy laws. Near ensures that its data providers obtain necessary consent from their data, data partner relays that information to Near and Near in turn deletes the data of such end user ensuring opt-out and deletion requests are met in accordance with the applicable privacy laws."

66. NNA also gave knowingly false responses to a questionnaire provided by a third-party auditor retained by another customer in connection with another customer agreement.

67. Finally, on information and belief, NNA gave false information to state and local officials about geolocation data relating to consumers who visited reproductive health clinics.

**PLAINTIFF'S EMPLOYMENT WITH DEFENDANTS**

68. On April 18, 2022, plaintiff began his employment with NNA as Senior Director, Business Development.

69. On October 1, 2022, NNA promoted plaintiff to Vice President, Business Development.

70. During December 2022 and January 2023, Anil Mattews, Chief Executive Officer, and Shobhit Shukla, President, expressed further confidence in plaintiff's business development activities by committing additional resources to support the growth of Identity Solution and the other marketing intelligence products for which plaintiff was responsible.

71. At all times, plaintiff's performance was good and Near regarded it as good.

## PLAINTIFF ENGAGES IN PROTECTED ACTIVITY

72. In August and September 2022, plaintiff raised Near's non-compliance with applicable privacy laws, regulations and standards to senior leaders.

73. Those leaders were "supervisors" as defined in N.J.S.A. 34:19-2(d).

74. He was assured that Near would be fully compliant by January 2023.

75. In January 2023, plaintiff learned that Near remained non-compliant and had failed to take any actions to become compliant.

76. Further, plaintiff learned that Near would not be compliant until May 2023 at the earliest.

77. During January and February 2023, during group sales meetings at which plaintiff's supervisor was present, plaintiff repeatedly reported and objected to Near's ongoing noncompliance with applicable data protection laws, regulations and industry standards.

78. Plaintiff also put his objections in writing.

79. In particular, on February 5, 2023, plaintiff emailed his supervisor, Laurent Castailac, the following:

> At this point, for the opportunities you mentioned and others, I honestly feel they should not be in commit for the quarter… I do not know what is real and what is made up. What is the truth and what is a lie. I have zero confidence that any of this is scalable based on the current structure, support and operations.
>
> A huge problem for these opportunities and others, is that I was assured we were going to be SOC2/ ISO compliant by end of January and that the work for that was started in September 2022 by [    ]. Only recently have I learned that the work started a few weeks ago (by another firm) and will not be done until May. **False claims of compliance have been made to [    ] and others.** I have been working diligently based on those assurances and invested my personal equity with the partners.
>
> (emphasis added)

80. Plaintiff reasonably believed that Near was not compliant with the applicable privacy laws and regulations.

81. Plaintiff reasonably believed that Near had made false statements to its customers.

82. Castailac was a "supervisor" as defined in N.J.S.A. 34:19-2(d).

83. Castailac was intolerant of plaintiff's objections to Near's unlawful and fraudulent activities and retaliated by berating plaintiff in front of the sales team on several occasions.

84. During the February 24, 2023 group sales call, plaintiff stated that the revenue forecasts for three deals on which he had been working had to be adjusted downward because Near's lack of compliance prevented the company from meeting its deliverables.

85. Castillac informed plaintiff he would follow up with him in a separate conversation.

### DEFENDANTS TERMINATE PLAINTIFF'S EMPLOYMENT

86. On March 2, 2023, the next time that Castailac spoke to plaintiff, he informed plaintiff that Near was terminating his employment.

87. The Individual Defendants made the decision to terminate plaintiff's employment in retaliation for his protected whistleblowing activity.

88. At the termination meeting, Castailac told plaintiff that Near was terminating his employment because he was not a good "cultural fit."

89. That explanation made no sense.

90. If plaintiff was not a good fit, he would not have been promoted in October 2022, among other things.

91. Castailac's explanation for the termination only makes sense if it is interpreted as a reference to Near's practice of defrauding customers and investors with false claims of compliance.

92. Indeed, in December 2022, Near terminated the employment of its Chief Revenue Officer because he objected to the same misconduct as plaintiff.

93. In late 2022-early 2023, Near also terminated the employment of the head of the data science team, for making similar objections.

94. At the time that defendants terminated plaintiff's employment, Near's upper management had a singular goal: to make it through the 180-day holding period following the initial public offering and then sell their shares for maximum value.

95. Defendants terminated the employment of employees like plaintiff and others whose whistleblowing activities threatened that goal.

## THE HARM TO PLAINTIFF

96. Plaintiff has sustained substantial economic losses as a result of the termination of his employment.

97. Plaintiff has also suffered severe emotional distress.

## COUNT ONE

98. Plaintiff refers to the allegations of the prior paragraphs as if set forth at length herein.

99. Plaintiff was an "employee" of defendants as that term is defined in CEPA, N.J.S.A. 34:19-2.

100. Each of the defendants was plaintiff's "employer" as that term is defined in CEPA, N.J.S.A. 34:19-2.

101. Plaintiff reasonably believed that the defendants engaged in conduct that was unlawful and/or fraudulent.

102. Plaintiff engaged in protected activity by reporting defendants' unlawful and fraudulent activity to a "supervisor" or "supervisors", objecting to defendants' unlawful and fraudulent conduct and refusing to participate in defendants' unlawful and fraudulent conduct.

103. Defendants retaliated against plaintiff because he had engaged in protected whistleblowing activity in violation of the Conscientious Employee Protection Act, N.J.S.A. 34:19-1 *et seq.*

104. Plaintiff has suffered substantial economic losses, emotional pain suffering and humiliation and other damages as a result of the defendants' retaliatory actions.

105. Upper management either participated in, or were willfully indifferent toward, the unlawful retaliatory conduct.

106. Defendants' conduct was especially egregious.

107. Each of the defendants may be held jointly and severally liable for his or its retaliatory conduct.

WHEREFORE, plaintiff demands judgment against defendants for back pay, front pay, compensatory damages for emotional pain, suffering and humiliation, punitive damages, attorneys' fees, costs, tax gross-up and such other relief as the Court deems equitable and just, including but not limited to, pre- and post- judgment interest.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

## DESIGNATION OF TRIAL COUNSEL

Michael F. O'Connor, Esq. is hereby designated as trial counsel pursuant to Rule 4:25-4.

## CERTIFICATION PURSUANT TO R. 4:5-1

I certify that the matter in controversy in the within action is not pending in any other court, or any pending arbitration proceeding, nor is any such court proceeding or arbitration proceeding presently contemplated. There are no other persons who should be joined at this time. I certify that confidential personal identifiers have been redacted from documents now submitted to the Court and will be redacted from all documents submitted in the future in accordance with Rule 1:38-7(b).

                    McMORAN, O'CONNOR BRAMLEY & BURNS
                    A Professional Corporation
                    Ramshorn Executive Centre
                    Building D, Suite D-1
                    2399 Highway 34
                    Manasquan, New Jersey 08736
                    Attorneys for plaintiff, Brian Nash

By:    /s/ Michael F. O'Connor
        MICHAEL F. O'CONNOR

Dated: September 18, 2023